UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARC HIMMELSTEIN,

    Plaintiff,

        v.                          Civil Action No.  12-1475 (JEB)

COMCAST OF THE
DISTRICT, L.L.C, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Dissatisfied with his cable provider, Plaintiff Marc Himmelstein terminated his service agreement with Comcast in June 2010.  His services were subsequently disconnected, and Comcast's equipment was removed from his home.  A modem was mistakenly left behind, however, and his account was charged $220 for the unreturned equipment.  This outstanding balance was then forwarded to a collection agency – Defendant Credit Protection Association, L.P. (CPA) – and was ultimately reported to the national credit-reporting agencies.  Upon discovering the mix-up, Himmelstein returned the modem to Comcast and sought to have the company correct his account.  Despite reassurances from Comcast that the issue was resolved, the mistake remained on his credit report, which ultimately resulted in Himmelstein's having to pay an additional $26,000 when he sought to refinance the mortgage on his home.

Plaintiff thus brought this suit, asserting four causes of action against Comcast and three against CPA.[1]  Himmelstein asserts claims of breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), negligence (Count III), and constructive fraud

---

[1] Although Plaintiff names two different Comcast entities as Defendants, the Court, for ease of reference, will simply refer to them jointly as "Comcast."

1

(Count IV) against Comcast. He sues CPA for negligence (Count V), constructive fraud (Count VI), and violations of the Fair Credit Reporting Act (Count VII). Although CPA has filed an Answer, Comcast now moves to dismiss Counts II-IV under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. The Court, agreeing with some defense arguments, will grant the Motion as to Counts II and IV, and deny it as to Count III. Because Comcast has not challenged Count I, that claim, as well as those against CPA, may also proceed.

I.  **Background**

According to the Complaint, which must be presumed true at this stage, Himmelstein was a long-time customer of Comcast, receiving residential cable and high-speed internet services at his home in Northwest Washington. See Compl., ¶ 9. These services were provided pursuant to a service contract with Comcast. See id., ¶ 10 & Exh. A (Comcast Agreement for Residential Services). Himmelstein elected to terminate his contract around June 2010, contacting Comcast to schedule a time for services to be disconnected and the equipment to be removed from his home. See id., ¶¶ 12, 14.

A Comcast technician came to his residence on June 17, 2012, to remove the equipment, picking up the cable box, but inadvertently leaving behind a modem. See id., ¶¶ 15, 19, 21. Himmelstein, under the impression that all equipment had been picked up by the technician and that he would be receiving a credit for $123.19 when his account was terminated, contacted Comcast in August 2010 to inquire about the refund. See id., ¶¶ 15-19. On this call, he was informed for the first time that he owed Comcast approximately $220 for cable-modem equipment that had not been returned. See id. "Shortly thereafter, Himmelstein received a demand letter from a collection agency [CPA] seeking to recover, on Comcast's behalf, the alleged $220.00 outstanding balance." Id., ¶ 21. He then contacted Comcast again regarding the

status of the account and was told that the charge would be removed and corrected when he returned the missing modem. See id. Himmelstein located the missing modem and returned it immediately to Comcast. See id., ¶ 22.

Despite contacting Comcast "on at least three occasions," Himmelstein received no written confirmation from Comcast that they had received the modem, but he was told that his account balance had been corrected and he would be issued a refund check. See id., ¶ 23. Himmelstein never received the refund check, however, and CPA continued to pursue collection of the $220 balance. See id., ¶¶ 24-25. The collection agency, moreover, reported the debt to the national credit-reporting agencies in December 2010. See id., ¶ 26. When Himmelstein contacted CPA to dispute the debt, it acknowledged the error, ceased collection on the account, and contacted Comcast to report the account for deletion – but never contacted the national credit bureaus regarding the mistake. See id., ¶¶ 27-28.

Later that spring, Himmelstein sought to refinance his mortgage with Citibank. See id., ¶ 29. His credit report continued to reflect the Comcast debt, despite Himmelstein's repeated efforts to redress this with both Comcast and CPA. See id. Because of this outstanding debt, Citibank required Himmelstein to pay an additional $26,000 (1% of the value of the mortgage) for the same loan. See id., ¶ 30. In addition to these added financing costs, he has never received the $123.19 credit he was owed upon termination of his account. See id., ¶ 33.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted." When the sufficiency of a complaint is challenged under Rule 12(b)(6), the factual allegations presented in it must be presumed true and should be liberally construed in a plaintiff's favor. Leatherman v. Tarrant

Cnty. Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993). Although the notice-pleading rules are "not meant to impose a great burden on a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation omitted). Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 556 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 555.

**III.   Analysis**

In moving to dismiss, Comcast raises putative defects in three of the four causes of action asserted against it (Counts II, III & IV). It does not, however, seek to dismiss the breach-of-contract claim (Count I). The Court will address the three challenges in turn.

A.   Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendant first contends that Himmelstein has failed to allege facts that would permit the Court to infer that Comcast acted with the bad faith required to state a claim for breach of the implied covenant of good faith and fair dealing. See Mot. at 6-8. Plaintiff counters that it has alleged sufficient bad faith in "Comcast's repeated egregious behavior and misrepresentations made throughout the collections process," and the "fact that Comcast's errors and misrepresentations occurred at least three (3) times to a single customer is sufficient to infer that Comcast's actions were not merely a simple 'mistake, misunderstanding, or oversight,' . . . but

4

rose to the level of bad faith." Opp. at 12. The Court disagrees. The accounting mistakes made by Comcast in handling Himmelstein's account – while unquestionably frustrating – do not raise an inference of bad faith sufficient to state a claim for breach of the covenant.

The District of Columbia recognizes that "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." Hais v. Smith, 547 A.2d 986, 987 (D.C. 1988) (internal quotation marks and citation omitted); see also Allworth v. Howard Univ., 890 A.2d 194, 201 (D.C. 2006) ("all contracts contain an implied duty of good faith and fair dealing") (internal citation omitted). A party may be liable for a breach of this duty if it "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000).

In Allworth, the court looked to the Restatement for guidance on the meaning of "good faith" in the context of a breach of the covenant, noting:

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate standards of decency, fairness or reasonableness.

Allworth, 890 A.2d at 201-202 (quoting Restatement (Second) of Contracts § 205 cmt. a). The court further observed that bad faith "'may be overt or may consist of inaction,'" involving "'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'" Id. (quoting Restatement § 205 cmt. d).

Significantly, the court noted that "'[b]ad faith means more than mere negligence . . . .'" Id. (quoting Gupta v. New Britain Gen. Hosp., 687 A.2d 111, 122 (Conn. 1996)); see also Maljack Prod., Inc. v. Motion Picture Ass'n of America, Inc., 52 F.3d 373, 375 (D.C. Cir. 1995) (applying California law, but noting breach of covenant requires "a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement," rather than "honest mistake, bad judgment or negligence") (internal quotations and citations omitted).

Plaintiff has failed to allege facts here that would permit the Court to infer that Defendant acted with the requisite bad faith or willfully rendered imperfect performance. Defendant's actions amount to a series of mistakes and were not the result of an interested or corrupt motive. See Burnsed Oil Co. Inc. v. Grynberg, 320 Fed. App'x 222, 230 (5th Cir. 2009) (applying Mississippi law in holding, "Bad faith is more than bad judgment or negligence: it is a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive and implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.") (internal quotation marks and citation omitted). While Himmelstein consistently attempts to frame Comcast's actions as "bad faith" conduct, see Compl., ¶¶ 46-49, the Court must look beyond "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" when evaluating a Rule 12(b)(6) motion. See Iqbal, 556 U.S. at 678 (internal citation omitted). The Court cannot infer that Comcast's bungled handling of Himmelstein's account was motivated by a malevolent intent; indeed, it appears that Comcast sought to redress its errors, though ultimately failing to do so, since it mailed Himmelstein a shipping box for the missing modem and "informed [him] that if

the missing modem were located and returned, the charge would be removed and corrected." Compl., ¶ 21.  Additionally, "Comcast notified Himmelstein that his account balance had been corrected and a refund check would be issued automatically."  Id., ¶ 23.  These allegations do not permit a sufficient inference of bad faith, even if Comcast ultimately failed to make good on these assurances.  The Court will thus grant Defendant's Motion as to Count II.

    B.  Count III:  Negligence

Comcast next maintains that Plaintiff's negligence claim fails because he did not sufficiently allege that Comcast owed him any duty of care; without such a duty, the mere negligent breach of a contract cannot sustain an action sounding in tort.  See Mot. at 9-10.  Himmelstein disputes this, arguing that the special relationship between a creditor and a debtor gives rise to an independent duty upon which his negligence claim is based.  See Opp. at 15-17.  After first discussing this duty question, the Court will address two other issues related to the negligence claim: the liability-limitation provision in the contract and the economic-loss doctrine.

        1.    Duty

To establish a negligence claim, a plaintiff must show "(1) a duty, owed by the defendant to the plaintiff, to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff proximately caused by the defendant's breach."  Dist. of Columbia v. Fowler, 497 A.2d 456, 462 n.13 (D.C. 1985).  A negligence claim based solely on a breach of the duty to fulfill one's obligations under a contract, however, is duplicative and unsustainable.  See, e.g., Choharis v. State Farm Fire and Cas. Co., 961 A.2d 1080, 1089 (D.C. 2008) ("[T]he tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship.

The tort must stand as a tort even if the contractual relationship did not exist."). Plaintiff must thus allege an independent duty to support his negligence claim. Whether such a duty exists is a question of law for the Court. Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789, 811 (D.C. 2011).

At issue, then, is "essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." Id. at 793 (internal quotation marks and citation omitted); see also Islam v. Option One Mortg. Corp., 432 F. Supp. 2d 181, 195 (D. Mass. 2006) ("'[T]he problem of duty is as broad as the whole law of negligence, and . . . no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself . . . . [D]uty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.'") (quoting William L. Prosser & W. Page Keeton, Prosser & Keeton on Torts, § 53, at 357-58 (5th ed. 1984)).

Plaintiff maintains that District of Columbia law "expressly recognizes" a duty resulting from the special relationship between a creditor and debtor. See Opp. at 16. He cites no authority from this jurisdiction, however, showing that a debtor-creditor relationship standing alone creates an independent duty that would support a negligence claim. Instead, Plaintiff directs the Court to *dicta* in a footnote in Waldon v. Covington, 415 A.2d 1070 (D.C. 1980), which noted that certain conduct may support a claim of intentional infliction of emotional distress where there is a special relationship, such as a debtor-creditor relationship. See id. at 1076 n.21 (citation omitted). Neither Waldon – nor the 1939 D.C. Circuit case upon which it relies – discussed the central question identified in Hedgepeth of whether, as a matter of policy,

the law should extend the responsibility for negligent conduct to a creditor in a simple creditor-debtor relationship.

In fact, there are at least two cases from this District suggesting that the creditor-debtor relationship may not create such a duty. In Overseas Private Inv. Corp. v. Industria de Pesca, N.A., Inc., 920 F. Supp. 207 (D.D.C. 1996), Judge Paul Friedman dismissed a counterclaim against OPIC, finding that no fiduciary duty existed between the creditor and debtor. See id. at 209-10. The Court stated that it was

> not persuaded that defendants/counter-plaintiffs have alleged the basis for finding a fiduciary relationship. The relationship between a debtor and a creditor in a loan transaction is "ordinarily a contractual relationship . . . and is not fiduciary in nature." Yousef v. Trustbank Sav., FSB, 568 A.2d 1134, 1138 (Md. 1990); see Paradise Hotel Corp. v. Bank of Nova Scotia, 842 F.2d 47, 53 (3d Cir. 1988); Reid v. Key Bank of Southern Maine, 821 F.2d 9, 16-18 (1st Cir. 1987).

Id. at 210. The court further noted that there were "no special circumstances" or any provisions in the parties' contract that supported an argument that the lender had "assumed any special relationship of trust or confidence in this particular case." Id. Subsequently, in Ponder v. Chase Home Finance, LLC, 666 F. Supp. 2d 45 (D.D.C. 2009), another court in this District dismissed a borrower's claim of negligence arising from the lender's alleged failure to accurately deliver loan documents, finding there was no special duty owed by the defendant to the plaintiff. Id. at 49-50. In so holding, the court recognized that "[t]he relationship between a debtor and a creditor is ordinarily a contractual relationship and not a fiduciary relationship." Id. at 49 (citing Overseas Private Inv. Corp., 920 F. Supp. at 210).

Authority from outside this jurisdiction only further complicates the matter, with cases reaching conflicting outcomes on the issue of whether the debtor-creditor relationship creates an independent duty sufficient to support a negligence claim. Compare Verizon Advanced Data v.

9

Frognet, Inc., No. 05-955, 2010 WL 1433325, at *13 (S.D. Ohio April 2, 2010) (billing disputes between contracting parties may only be resolved "through a contract action because Verizon did not have any legal duties in this regard separate and apart from those it assumed in the agreement. Without a duty owed separately from that created by the contract, FrogNet's claim for negligence cannot stand.") (internal quotation marks and citations omitted); Mercado v. Bank of America, N.A., No. 12-1123, 2012 WL 5629749, at *4 (D.N.J. Nov. 15, 2012) (dismissing negligence claims and noting that "'[t]he virtually unanimous rule is that creditor-debtor relationships rarely give rise to a fiduciary duty'") (quoting United Jersey Bank v. Kensey, 704 A.2d 38 (N.J. App. Div. 1997)); Muller-Paisner v. TIAA, No. 03-6265, 2012 WL 3205583, at *7 (S.D.N.Y. Aug. 9, 2012) (recognizing duty does not normally arise between parties in commercial transactions – including creditor-debtor relationship – unless there is a "relationship of confidence, trust, or superior knowledge or control") (internal quotation marks and citations omitted); LaPosta v. Lyle, No. 11-177, 2012 WL 1752550, at *7 (N.D.W.Va. May 16, 2012) (no duty sufficient to support negligence claim unless plaintiffs could establish "that the relationship between the parties was such that the creditor went above and beyond the normal relationship between debtor and creditor so as to create a 'special relationship'") (internal citation omitted); Zaffrullah v. Countrywide Home Loans, Inc., No. 09-61142, 2010 WL 503074, at *5 (S.D. Fla. Feb. 8, 2010) (dismissing negligence claim where party "failed to plead a recognizable duty in what was an arms-length creditor/debtor relationship"); In re Montagne, No. 08-10916, 2010 WL 271347, at *9 (Bankr. D. Vt. Jan. 22, 2010) (no duty sufficient to support negligence claim by debtor against creditor where "the sources of 'duty' . . . are contract claims garbed in negligence clothing and are therefore insufficient to state a claim. [There is no duty] owed to him, independent of its contractual duty, and thus the negligence claim fails as a matter of law"); with

Vickie M. Champion v. Global Credit Card Serv., LLC, No. 12-1966, 2012 WL 3542225, at *8 (N.D. Ala. Aug. 15, 2012) (recognizing "duties owed by a creditor to individuals to whom it issues credit are, *e.g.*, a duty to maintain accurate records and a duty not to report false information about those individuals to third parties"); Colo. Capital v. Owens, 227 F.R.D. 181, 188 (E.D.N.Y. 2005) (finding that creditor owed debtor "a duty of reasonable care in the handling of his account, which includes the collection of his debt"); Tourgeman v. Collins Financial Serv., Inc., No. 08-1392, 2010 WL 4817990, at *6 (S.D. Cal. Nov. 22, 2010) (citing Colo. Capital as support for creditor-debtor duty).

In a lengthy analysis of whether such a duty should be recognized, a district court in Massachusetts recognized the "uncertainty surrounding the existence of a negligence duty." Islam, 432 F. Supp. 2d at 198. The court there ultimately permitted the negligence claims to move forward, but noted that if the plaintiffs were successful on those claims, "the Court may consider it appropriate to certify this question – and the fully developed record – to the Supreme Judicial Court of Massachusetts . . . for a definitive answer." Id. Finding the question of duty similarly unresolved here, the Court will permit Plaintiff's claims to proceed at this stage of the litigation, pending further briefing by the parties after some discovery.

2.   *Limitation of Liability*

Comcast also challenges the scope of damages that Plaintiff may obtain through his negligence claim, maintaining that he is preempted from seeking consequential damages by the limitation-of-liability provision in the contract. See Mot. at 10. Himmelstein contends that "the actual limitation of liability clause is far narrower" than Comcast contends and thus does not bar his claims. Opp. at 5; see also id. at 5-10. The Court agrees.

The parameters of these limitations are set forth in Section 11 of the Comcast Agreement for Residential Services, which is entitled "Limitation of Comcast's Liability." See Mot., Exh. A (Agreement) at 10-15. In subsection (a), entitled "Application," the agreement states:

> The limitations of liability set forth in this Section apply to any acts, omissions, and negligence of Comcast and its underlying third-party service providers, agents, suppliers, distributors, licensors and business partners (and their respective officers, employees, agents, contractors or representatives) which, <u>but for that provision</u>, would give rise to a cause of action in contract, tort or under any other legal doctrine.

<u>Id.</u> at 10-11 (emphasis added). The limitations are thus bounded by the subsequent provisions identifying the acts and omissions that are covered by the clause. These subsequent subsections of (b) – (g) set forth limitations on liability related to: "Customer Equipment," "Other Services or Equipment," "Software," "Disruption of Services," "Directory Listings," and "Third Parties." <u>Id.</u> at 11-14. In each of these subsections, the agreement identifies the specific type of harms covered by the limitation provision, as well as the scope of remedies available to the customer pursuant to these limitations. <u>See</u> <u>id.</u>

Defendant appears to acknowledge that none of these provisions expressly covers the underlying actions here, but maintains that "[b]illing for services, and any alleged billing errors and attendant collection activities, plainly result directly or indirectly from or in connection with Mr. Himmelstein's use of Comcast's service. But for his subscription to and use of Comcast's services, Mr. Himmelstein would not have any dispute with Comcast." Reply at 4. This reasoning, however, would render the specific provisions identifying the covered actions in subsections 11 (b) - (g) meaningless, as it would limit Comcast's liability for <u>any</u> act or omission of any sort, since all such acts would "plainly result directly or indirectly from or in connection with Mr. Himmelstein's use of Comcast's service." Because the agreement circumscribes the

12

limitations on liability to specific harms, and the harm here is not covered by any of these provisions, Himmelstein is not barred from seeking consequential damages by the liability-limitation provision in the agreement.

### 3.     *Economic-Loss Doctrine*

The Court, however, cautions that it has serious concerns that Plaintiff's claims may alternatively be barred by the economic-loss doctrine – an issue that has not been discussed by the parties, but should be addressed in subsequent pleadings.  The economic-loss rule "bars a plaintiff from recovering for purely economic losses under a tort theory of negligence." In re Michaels Stores Pin Pad Litig., 830 F. Supp. 2d 518, 528 (N.D. Ill. 2011); see also Potomac Plaza Terraces, Inc. v. QSC Prod., Inc., 868 F. Supp. 346, 354 (D.D.C. 1994) (adopting economic-loss doctrine); RLI Ins. Co. v. Pohl, Inc. of America, 468 F. Supp. 2d 91, 94 (D.D.C. 2006) (finding "the District of Columbia 'has not authorized tort recovery for purely economic losses in a contract setting'") (quoting Furash & Co. v. McClave, 130 F. Supp. 2d 48, 56 (D.D.C. 2001)).

Almost all of the loss here results from the higher cost of financing for Himmelstein's mortgage. See Compl., ¶ 54 ("Himmelstein has suffered damages related to: unpaid refunds of prepaid fees; fees charged by mortgage lenders on Himmelstein's March 2011 refinance; pre-filing attorney's fees related to correction of the improper accounting; post-filing attorney's fees; and other fees and costs . . . ."). While there do not appear to be any cases within this jurisdiction where a court has reviewed such damages under the economic-loss doctrine, there are several cases from Texas that have rejected similar claims involving damages resulting from increased borrowing costs.  In Blanche v. First Nationwide Mortg. Corp., 74 S.W. 3d 444 (Tex. App. 2002), the court rejected a negligence claim stemming from the lender's handling of the

borrower's account and incorrect reporting of account information to credit bureaus, where the specified damages included "the denial of various loans and the payment of higher interest rates." Id. at 453.  Additionally, in Belanger v. BAC Home Loans Servicing, L.P., 839 F. Supp. 2d 873 (W.D. Tex. 2011), relying upon Blanche, a district court held that Belanger's negligence claim was barred where "the only damages claimed by Belanger are the increased costs of borrowing," due to the damage to his credit score.  Id. at 877; see also Sanghera v. Wells Fargo Bank, N.A., No. 10-2414, 2012 WL 555155, at *6 (N.D. Tex. Feb. 21, 2012) (loss of creditworthiness an economic damage arising from breach of parties' contractual relationship, which was barred by economic-loss rule); In re Thrash, 433 B.R. 585, 598-600 (N.D. Tex. Bankr. 2010) (court did not reach question of whether duty existed, finding negligence claims were otherwise barred because parties' inability to refinance their home and increased interest rates resulting from delinquency defendant reported to credit bureaus were not damages that supported a negligence claim).  While none of these cases is controlling, the Court nonetheless finds the reasoning sufficiently persuasive to require Plaintiff to explain in further submissions why his negligence claim should survive.

    C.  Count IV:  Constructive Fraud

Finally, Defendant contends that Himmelstein's constructive-fraud count should be dismissed as he cannot allege the "confidential relationship" essential for such a claim.  See Mot. at 11-12.  Himmelstein's relationship with Comcast is limited to that of a cable subscriber to his cable-services provider, Defendant argues, and there are no facts suggesting the relationship extended beyond the terms of their contract.  See id. at 12.  Plaintiff responds that no confidential relationship is required to assert a cause of action for constructive fraud and that he has alleged sufficient facts to sustain this claim based on Comcast's breach of its legal duty to keep an

accurate assessment of Himmelstein's account and to accurately report the status of the account to credit agencies.  See Opp. at 14-15.  The Court rejects Himmelstein's attempt to eliminate the special-relationship requirement from a constructive-fraud claim.  Even if this relationship were not required, the claim would nonetheless fail as Plaintiff has not alleged that he relied on Comcast's representations.

Under District of Columbia law, a plaintiff claiming fraud must prove "(1) the defendant made a false representation; (2) in reference to material fact; (3) with knowledge of its falsity; (4) with the intent to deceive the plaintiff; (5) the plaintiff acted in reasonable reliance on that representation; (6) which consequently resulted in provable damages." Essroc Cement Corp. v. CTI/D.C., Inc., 740 F. Supp. 2d 131, 145 (D.D.C. 2010); see also Schiff v. AARP, 697 A.2d 1193, 1198 (D.C. 1997) (citing Howard v. Riggs Nat'l Bank, 432 A.2d 701, 706 (D.C.1981)). Constructive fraud includes all the same elements as actual fraud, except the intent to deceive. See De May v. Moore & Bruce, L.L.P., 584 F. Supp. 2d 170, 185 (D.D.C. 2008) ("neither actual dishonesty nor intent to deceive is the essential element [of constructive fraud]; and negligence so gross as to deceive might be such fraud") (citing Rick v. United States, 161 F.2d 897, 899 (D.C. Cir. 1947)).

In addition to these requirements, constructive fraud requires a plaintiff to demonstrate the existence of a confidential relationship between himself and the defendant, "by which the defendant is able to exercise extraordinary influence over plaintiff."  McWilliams Ballard, Inc. v. Broadway Mgmt. Co., 636 F. Supp. 2d 1, 7 n.7  (D.D.C. 2009) (quoting Witherspoon v. Philip Morris, 964 F. Supp. 455, 461 (D.D.C. 1997)) (internal quotation marks omitted); see also Lee v. Bos, No. 11-1982, 2012 WL 2852235, at *3 (D.D.C. July 11, 2012) (citing 3D Global Solutions, Inc. v. MVM, Inc., 552 F. Supp. 2d 1, 8 (D.D.C. 2008)) . The requisite "special relationship"

requires more than parties' transacting at arms' length and is one "in which one party has gained the trust and confidence of the other, enabling the first party to exercise extraordinary influence over the other." 3D Global Solutions, Inc., 552 F. Supp. 2d at 8 (quoting Witherspoon, 964 F. Supp. at 461) (internal quotation marks omitted); see also Cordoba Initiative Corp. v. Deak, No. 11-1541, 2012 WL 5285132, at *5 (D.D.C. Oct. 26, 2012) (special relationship where "special trust and confidence" based on Deak's "advising and supporting Cordoba over several years").

In Goldman v. Bequai, 19 F.3d 666 (D.C. Cir. 1994), this Circuit, applying District of Columbia law, provided guidance on the factors to use in determining whether such a relationship exists: "Mental capacity, age, education, business knowledge, and the extent to which the alleged victim entrusted her affairs to the other party are among the relevant factors in establishing the existence of such a relation." Id. at 674. Given this high threshold, the Court declines Plaintiff's invitation to find "constructive fraud, absent a confidential relationship, where a defendant's conduct violates a public confidence." Opp. at 14 (pointing to authority from outside the District of Columbia, such as "[m]any state and federal courts, including Maryland," but acknowledging no precedent for such an interpretation in D.C.).

Holding that a confidential relationship is required, the Court finds that Plaintiff has not alleged sufficient facts to suggest its existence here. As a court in this District noted in Witherspoon, "Establishing a confidential relationship is a difficult burden." 964 F. Supp. at 461. The court there rejected the plaintiff's argument that the manufacturer-consumer relationship could be characterized as confidential because of its length of time – 38 years – and the fact that the consumer had received "personalized mail" from the manufacturer, noting that the plaintiff was "only one of millions of consumers and potential consumers targeted by Defendant's advertisements," and the personalized mail the plaintiff received from the defendant

16

"is not enough to create a relationship of trust that could be likened to one with a close family member, attorney, or a priest from whom one gets personal counseling." Id. at 461-62; see also Geiger v. Crestar Bank, 778 A.2d 1085, 1095 (D.C. 2001) (no special relationship where parties' interactions were limited to contractual agreement and no facts "detailing a history of interaction between Mr. Geiger and Crestar which extended their relationship beyond the provisions of the account agreement"). Similarly, Himmelstein's interactions with Comcast did not create any relationship of special trust, nor do his phone contacts with various Comcast representatives subsequent to the termination of services transform this basic consumer relationship into something more.

Even if Himmelstein could allege such a relationship, he cannot satisfy the detrimental-reliance element of constructive fraud, as he does not allege that he took any action – or refrained from taking any – in reliance on Comcast's representations. See Essroc, 740 F. Supp. 2d at 145. The Court will thus grant Defendant's Motion as to Count IV.

**IV.     Conclusion**

For the foregoing reasons, the Court will issue a contemporaneous Order this day granting Defendant's Motion to Dismiss Counts II and IV and denying its Motion as to Count III.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:   December 10, 2012